IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIE LEE JILES, and LEMARR WASHINGTON,<br><br>Defendants. | 8:23CR98<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on the Motion to Suppress (Filing No. 26) and Motion to Dismiss (Filing No. 28) filed by Defendant Willie Lee Jiles ("Jiles"), as well as the Motion to Suppress (Filing No. 48) and Motion to Dismiss (Filing No. 50) filed by Defendant Lemarr Washington ("Washington"). An evidentiary hearing was held on the motions on November 6, 2023. A transcript has been filed and the motions are now ripe for disposition.

Having carefully considered all arguments presented in both the evidentiary hearing and briefs, and for the reasons explained below, the undersigned will recommend that the motions be denied.

**FACTS**

Seward County Sheriff's Deputy Chase Parmer ("Deputy Parmer") testified at the evidentiary hearing. Deputy Parmer has worked for the Seward County Sheriff's Office since April 2020. (TR. 11.) Before that, Deputy Parmer worked for the Seward Police Department. (TR. 11.) Deputy Parmer is assigned to the criminal interdiction task force that conducts high-volume traffic stops on I-80 to interdict criminals traveling with illegal contraband. (TR. 11-12.)

Deputy Parmer testified he has attended numerous national interdiction conferences and training classes. (TR. 12.) He is also an associate instructor for Desert Snow, a criminal interdiction training company. (TR. 12.) Deputy Parmer testified he stops around 30 to 40 vehicles a week. (TR. 12.)

Deputy Parmer has been a K-9 handler for approximately three-and-a-half years. (TR. 12.) Deputy Parmer's K-9, Keisy, is certified through the State of Nebraska. (TR. 14; Ex. 1.) Keisy is certified annually and was last certified the week before the evidentiary hearing. (TR. 15; Ex. 1.) Deputy Parmer stated that Keisy was certified at the time of the events underlying the pending motions to suppress. (TR. 14-15; Ex. 1.) Deputy Parmer testified that he has a four-hour training session with Keisy at least once a week. (TR. 15.) Deputy Parmer explained Keisy has several "alert" behaviors, which Deputy Parmer described as a change in behavior such as an over-interest in a certain area, possibly with her ears perking back. (TR. 15.) Deputy Parmer stated Keisy is typically very fast paced and then, all of a sudden, she will completely turn her body wherever she catches an odor, and then reintroduce herself to the spot where she had the alert. (TR. 15.) Deputy Parmer explained that Keisy is a "passive" indication dog, which means she will either sit, stand-and-freeze, or stand on her back legs with her front legs against something to indicate to the odor of narcotics. (TR. 15-16.)

Deputy Parmer testified that on March 2, 2023, at approximately 1:00 p.m., he was in his cruiser parked in the median on I-80 near mile marker 375. (TR. 17-18; TR. 48.) Deputy Parmer observed an Equinox with Wisconsin license plates traveling eastbound. (TR. 17-18; TR. 48.) Deputy Parmer testified that he pulled onto I-80 and caught-up with the Equinox near mile marker 385. (TR. 18; TR. 49.) Deputy Parmer stated that he simultaneously observed the Equinox commit a couple of traffic violations. (TR. 18.) Deputy Parmer stated the first violation he observed was the Equinox following too closely behind another vehicle. (TR. 18.) Deputy Parmer explained that following too closely is the number one contributing factor to accidents on the interstate, so officers conduct high-volume stops for that violation. (TR. 18.) He also explained that the Nebraska Driver's Manual suggests a three-second following distance between vehicles. (TR. 19.) Deputy Parmer acknowledged that the three-second rule is just a rule of thumb established by a safety council. (TR. 42-43.) Deputy Parmer testified the best way to enforce the three-second rule is to use a stopwatch, but that he now uses basic math. (TR. 19.)

Deputy Parmer stated the Equinox was following a semi in the outside lane of travel, going approximately 75 miles-per-hour. (TR. 19-20.) He testified the Equinox rushed-up on the semi that was traveling less than 75 miles-per-hour, and then switched to the inside lane of travel where it began following a silver SUV, at less than a one-second following distance. (TR. 20.) Deputy Parmer estimated the Equinox was also within one second of following distance behind the semi for a few seconds. (TR. 45-46.) Deputy Parmer stated the following distance was so close that he tried to get the traffic violation completely on camera using the cruiser's dash camera, which was affixed to the cruiser's windshield. (TR. 20; Ex. 3.) Deputy Parmer stated he got behind the Equinox to do so, but he could not get the SUV in the camera view because the Equinox was so close. (TR. 20; Ex. 3.) Deputy Parmer testified that in addition to the dash camera, he had a body camera recording the events. (TR. 21; Ex. 2.) Deputy Parmer stated he also noticed the window tint of the Equinox was too dark under state law. (TR. 22.) Deputy Parmer testified that after witnessing the violations, he decided to perform a traffic stop on the Equinox. (TR. 23.)

Deputy Parmer testified that before he left the median to follow the Equinox, he utilized a TLO system, which allowed him to get the name of the registered owner of the Equinox. (TR. 23.) Deputy Parmer stated when he looked-up the registered owner, he noticed the individual had a criminal history involving drug-trafficking charges. (TR. 23.) Deputy Parmer testified he also logged into a license plate reader ("LPR") system which allowed him to input the Equinox's license plate to see its recent path of travel. (TR. 23; TR. 49-50; Ex. 110.) Deputy Parmer's body camera footage captured the LPR system screen up on the mobile data terminal in Deputy Parmer's cruiser, which displayed an enlarged image of the Equinox. (TR. 24; Ex. 2.) Deputy Parmer stated the LPR system showed that the Equinox had made a quick turnaround trip. (TR. 23; Ex. 110.) Deputy Parmer testified the Equinox had traveled westbound through Grand Junction, Colorado, located in Mesa County, Colorado, which boarders Utah. (TR. 23; Ex. 110.) Deputy Parmer stated the Equinox went westbound on February 27, 2023, and then went back eastbound through Grand Junction at approximately 11:00 p.m. on March 1, 2023. (TR. 23; Ex. 110.)

Deputy Parmer testified the LPR system that the Seward County Sheriff's Office uses is called Vigilant Car Detector. (TR. 49.) He explained that there are cameras all over the United States that recognize license plates and capture pictures of license plates and vehicles. (TR. 49.) Deputy Parmer further testified that some departments and state patrol companies place cameras

3

over high-traffic areas to capture license plates. (TR. 49-50.) The captured images are then sent to a different database called Vigilant, that officers can log into. (TR. 49-50.) Deputy Parmer testified he got about five or six hits for the Equinox from the Vigilant database. (TR. 50; Ex. 110.)

Once Deputy Parmer stopped the Equinox, he approached the vehicle's passenger side. (Exs. 2-3.) Deputy Parmer explained the reason for the traffic stop and asked for the Equinox's registration and the driver's identification, which was provided. (TR. 26-27; Ex. 2.) Deputy Parmer identified the driver as Willie Jiles using Jiles' Wisconsin driver's license. (TR. 24; Ex. 2.) Deputy Parmer later identified the passenger as Lemarr Washington using Washington's Wisconsin driver's license. (TR. 25; Ex. 2.) Deputy Parmer asked Jiles to come to his cruiser while he completed a warning ticket. (TR. 26; Ex. 2.) Deputy Parmer testified that while he was standing at the passenger window of the Equinox, he could smell an overwhelming odor of air freshener coming from the vehicle. (TR. 27.) Deputy Parmer testified that the odor was so strong he believed it had just been sprayed. (TR. 27.) Deputy Parmer stated that he could also smell what he believed to be marijuana, but it was masked by the air freshener. (TR. 27.)

Jiles accompanied Deputy Parmer to the cruiser, and they engaged in conversation while Deputy Parmer was working on the warning ticket. (Ex. 2.) Jiles told Deputy Parmer he was trying to get to the bathroom and that he did not have any warrants. (Ex. 2.) Deputy Parmer explained the following-too-closely violation and asked Jiles how many feet he believed had been between him and the SUV. (TR. 28; Ex. 2.) Jiles provided Deputy Parmer a hand measurement, indicating there had been approximately six inches between the vehicles. (TR. 28; Ex. 2.) Deputy Parmer testified that giving Jiles credit, he believes there was probably more than six inches between the vehicles. (TR. 43.) Deputy Parmer told Jiles that he needed to keep three seconds of space between his vehicle and other vehicles because that is what the DMV recommends. (Ex. 2.) Jiles later acknowledged that he was probably following the SUV too closely. (TR. 28; Ex. 2.) Deputy Parmer also discussed the window tint with Jiles and explained that there could be issues with it. (TR. 28; Ex. 2.) Deputy Parmer testified he did not issue a ticket for the window tint violation and the window tint violation was not the basis for the traffic stop. (TR. 39.)

Deputy Parmer told Jiles the Equinox was registered to someone named "Tera" and asked Jiles if Tera was a mother or a wife. (Ex. 2.) Jiles responded that Tera was "girlfriend." (TR. 26;

4

Ex. 2.) Jiles told Deputy Parmer that Washington was his friend and that they had traveled a "little bit" west past Nebraska, but he could not think of a city or state that they had gone to. (TR. 26, TR. 28; Ex. 2.) Jiles said the purpose of the trip was to look around and that he was thinking about moving out of Wisconsin. (TR. 26; Ex. 2.) Jiles said they had been gone about a day to a day-and-a-half and that they were headed back to Milwaukee, Wisconsin. (TR. 26; Ex. 2.) Deputy Parmer testified that as he was speaking to Jiles in the cruiser, he provided dispatch with Jiles' information, and requested that dispatch check Jiles' license status and criminal history, as well as if Jiles had any outstanding warrants. (TR. 27; Ex. 2.) As the record check was taking place, Deputy Parmer was simultaneously preparing the written warning for the following-too-closely violation. (TR. 27; Ex. 2.)

Deputy Parmer testified that during his interaction with Jiles, he identified several indicators of criminal activity. (TR. 29.) Deputy Parmer testified the first indicator was that the LPR system showed a quick turnaround trip. (TR. 29.) He also noted that the registered owner's information showed a drug-trafficking charge. (TR. 29.) Deputy Parmer testified that when he initiated the traffic stop, he also observed the occupants of the Equinox moving around a lot in the vehicle. (TR. 29-30; Ex. 3.) Deputy Parmer further explained that he observed an overwhelming odor of air freshener coming from the vehicle and believed he could smell marijuana. (TR. 30.) Deputy Parmer could also see air fresheners in the vehicle. (TR. 30.) Deputy Parmer testified that Jiles was very nervous, and was touching his face, sweating, and watching Deputy Parmer very intently. (TR. 30; Ex. 2.) Jiles also kept making comments that his record was clean. (TR. 30; Ex. 2.)

Deputy Parmer testified he thought their travel plans were suspicious because Jiles was unable to think of a city or state that they had visited, even though he stated the purpose of the trip was to look for a place to move. (TR. 30.) Deputy Parmer testified that although the duration of the trip was only about a day to a day-and-a-half, it took Jiles several seconds to tell him how long their trip had been. (TR. 30.) Deputy Parmer testified that because Jiles was on a short trip, he should have been able to provide a quick response to that question. (TR. 30.) Deputy Parmer testified the information Jiles provided about the trip also conflicted with what the LPR system had told him, so he knew Jiles was being dishonest. (TR. 30-31.) Deputy Parmer stated that based on the timeline Jiles provided, there would have only been a couple days for driving all the way to

the western point of Colorado and then coming back to the same point, which revealed non-stop travel. (TR. 35-36.)

During the traffic stop, Deputy Parmer returned to the Equinox to verify its VIN number. (TR. 33; Exs. 2, 3.) While he was at the vehicle, he spoke to Washington. (TR. 33; Exs. 2, 3.) Washington rolled down the passenger-side window about two inches, and Deputy Parmer told him that he was going to give Jiles a warning for following-too-closely and he was going to check the window tint because it looked too dark. (TR. 34; Ex. 2.) Deputy Parmer asked Washington where they were coming from, and Washington told him that they had been in Las Vegas for a couple days. (TR. 34; Ex. 2.) Deputy Parmer returned to his cruiser to get his window tint meter, and then returned to the Equinox to check its tint. (TR. 34; Exs. 2, 3.) Deputy Parmer testified his conversation with Washington added to his suspicion of criminal activity. (TR. 34-35.) Deputy Parmer explained that because Las Vegas is a well-known city, anyone who travels there would remember the name of the city and state. (TR. 35.) Deputy Parmer stated Las Vegas is much further than a "little bit" past Nebraska, contrary to what Jiles told him. (TR. 35.) Deputy Parmer testified that based on those two major differences between Jiles' and Washington's stories, he knew that one of them was lying about the location of their trip. (TR. 35.)

Deputy Parmer testified that after observing the indicators of criminal activity, he decided to seek consent to search the vehicle. (TR. 32.) Deputy Parmer stated that at the conclusion of the traffic stop, after he had issued the warning to Jiles, Deputy Parmer started a normal conversation with Jiles and told Jiles he had a couple more questions. (TR. 32-33; Ex. 2.) Deputy Parmer asked Jiles if he had any weapons in the vehicle. (TR. 32; Ex. 2.) Deputy Parmer indicated Jiles' whole demeanor changed and Jiles told Deputy Parmer he had a concealed carry weapons permit, but that he did not have a weapon. (TR. 32; Ex. 2.) Deputy Parmer also asked Jiles if he had large amounts of currency or illegal narcotics in the vehicle, and Jiles responded he did not. (TR. 32; Ex. 2.) Deputy Parmer testified Jiles became flustered by these questions and his nervousness increased. (TR. 32-33; Ex. 2.) Deputy Parmer asked Jiles for consent to search the Equinox, and Jiles denied consent. (TR. 33; Ex. 2.)

Deputy Parmer informed Jiles that he was being detained, and deployed Keisy to sniff the Equinox. (TR. 33; Exs. 2, 3.) Deputy Parmer testified that Keisy gave a positive alert and indicated to the odor of narcotics coming from the Equinox. (TR. 36; Exs. 2, 3.) Deputy Parmer explained

6

that Keisy alerted through an over-interest in the driver's side seams of the Equinox, and then indicated by sitting down. (TR. 36; Exs. 2, 3.) Deputy Parmer stated that after Keisy indicated, he put her back in his cruiser, returned to the Equinox, and asked Washington to exit the Equinox. (TR. 37; Exs. 2, 3.) Deputy Parmer stated that as Washington exited the Equinox, he smelled an overwhelming odor of marijuana coming from the vehicle. (TR. 37.) Washington told Deputy Parmer he had smoked marijuana in the hotel in Las Vegas and that he had about $4,000 with him. (TR. 37; Ex. 2.) Deputy Parmer told Washington that he was going to search the Equinox based off the dog's indication and the marijuana odor. (TR. 37; Ex. 2.) Deputy Parmer had Washington sit in the rear of the cruiser. (Ex. 2.) Deputy Parmer then radioed dispatch and advised he was going to search the Equinox. (TR. 37; Exs. 2, 3.)

After Washington was detained, Deputy Parmer searched the Equinox. (TR. 38; Exs. 2, 3.) Deputy Parmer located several vacuum-sealed packages of a crystal substance in the rear cargo area. (TR. 38; Exs. 2, 3.) Deputy Parmer testified that, based on his training and experience, he knew the crystal substance was methamphetamine. (TR. 38.) Seven pounds of methamphetamine was discovered. (TR. 38.) Deputy Parmer testified that, at that point, Jiles and Washington were placed under arrest. (TR. 38.) After Jiles and Washington were told they were under arrest, Deputy Parmer read them their *Miranda* rights and they both acknowledged they understood their rights. (Ex. 2.) Deputy Parmer did not locate any marijuana in the Equinox, but Deputy Parmer testified that he smelled it on Washington when Washington exited the Equinox. (TR. 38.) When Deputy Parmer had Washington exit his cruiser to be placed in another law enforcement vehicle to be transported to the local jail, Deputy Parmer could still marijuana on Washington's person, so Deputy Parmer asked Washington if he had marijuana in his pants. (TR. 38; Ex. 2.) Washington told Deputy Parmer that he did, and Deputy Parmer had Washington remove the marijuana from his pants. (TR. 38; Ex. 2.) Deputy Parmer also located approximately $5,000 in Washington's pocket. (TR. 38.)

Deputy Parmer testified that a couple of other items of interest were found in the Equinox, including vehicle maintenance records for the Equinox in Washington's name and a hotel receipt in Washington's name. (TR. 63-64.) Deputy Parmer testified that based on these documents, he thought it was likely that the Equinox was also in Washington's possession. (TR. 65.)

7

Deputy Parmer stated that after the Equinox was searched, additional officers arrived on the scene, including Deputy Schultz, Deputy Bailey, and Sergeant Kevin Beattie. (TR. 65-66; Exs. 2, 3.) Deputy Parmer's body camera captured a conversation between Deputy Parmer and Deputy Schultz in which Deputy Schutlz said: "I got nosy and I checked them," to which Deputy Parmer replied, "No, you didn't check anything." (Ex. 2.) Deputy Parmer explained that this exchange related to the LPR system. (TR. 62.) Deputy Parmer stated that he does not like to disclose the existence of the LPR system because he does not want criminals to figure out where cameras are located and change their driving habits. (TR. 62.)

Tera Goodrich ("Ms. Goodrich") also testified at the evidentiary hearing. At the time of the events underlying the motions to suppress, Ms. Goodrich was Washington's girlfriend and the registered owner of the Equinox. (TR. 70.) Ms. Goodrich and Washington have since married. (TR. 71.) Ms. Goodrich testified that she had given Washington permission to operate the Equinox on the day in question. (TR. 71.) Ms. Goodrich testified that Washington had operated the Equinox before and had engaged in maintenance of the vehicle. (TR. 71.) Ms. Goodrich testified she was aware that Washington was taking the Equinox out of town. (TR. 71.) Ms. Goodrich further testified she was aware Jiles was going with Washington on the trip, and that she assumed Jiles would be driving at some point due to the distance they were traveling. (TR. 72-73.) Ms. Goodrich testified that the purpose of the trip was for Washington to visit his daughters in Las Vegas. (TR. 73-74.)

On March 3, 2023, a criminal complaint was filed against Defendants related to the traffic stop. (Exs. 101, 102.) The complaint alleged Washington and Jiles conspired to distribute methamphetamine on or about March 2, 2023, in violation of 21 U.S.C. § 846. (Exs. 101, 102.) Washington and Jiles were released from custody on March 8, 2023. (Ex. 201.) The government filed a motion to dismiss the criminal complaint without prejudice on March 28, 2023, which was granted by United States Magistrate Judge Michael Nelson the same day. (Exs. 203, 204.) On April 19, 2023, Washington and Jiles were indicted based on the events in the traffic stop. (Filing No. 1; Ex. 205.) The indictment alleges that Washington and Jiles conspired to distribute methamphetamine on March 2, 2023, in violation of 21 U.S.C. § 846. (Filing No. 1; Ex. 205.) A forfeiture provision was also included in the indictment. (Filing No. 1; Ex. 205.)

## DISCUSSION

1. **Motions to Dismiss**

Pursuant to 18 U.S.C. § 3161(b), any information or indictment charging an individual with the commission of an offense must "be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). Under 18 U.S.C. § 3162(a)(1), [i]f, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment of information is filed within the time limit required by [§ 3161(b)] . . . such charge against that individual contained in such complaint shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1). In determining whether dismissal should be with or without prejudice, considerations include "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on . . . the administration of justice." *Id*. However, the Eighth Circuit Court of Appeals has determined that "when the government drops a complaint but then later brings a new complaint or indictment on the same charge, the 30-day period runs from the second complaint or indictment." *United States v. Long*, 900 F.2d 1270, 1273 (8th Cir. 1990).

Defendants argue the charges against them should be dismissed with prejudice because more than thirty days passed between their arrest and indictment.[1] Defendants argue §3161(b) applies regardless of whether the government later decides to dismiss the complaint, and that the thirty-day limit should continue to run from the time a defendant is arrested. In light of Eighth Circuit law regarding this issue, Defendants' argument is rejected. The time between Defendants' arrest and the dismissal of the criminal complaint is not counted, nor is the time between the dismissal and the indictment counted. Because the thirty-day rule was not violated, Defendants' motions to dismiss should be denied.[2]

---

[1] Defense counsel presented this argument to preserve the issue for appellate review. (TR. 105.)

[2] Even assuming the charges should be dismissed pursuant to § 3162(a)(1), any dismissal should be without prejudice. Defendants have been charged with serious drug offenses. Further, any delay in seeking the indictment was not in bad faith. Rather, it was a consequence of coordination between multiple agencies, the collection of discovery, and then the delivery of discovery to the U.S. Attorney's Office. Moreover, any delay did not prejudice Defendants as they were not in custody at the time the indictment was filed.

## 2. Motions to Suppress

### A. Traffic Violation

A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation. *United States v Andrews* 454 F.3d 919, 921 (8th Cir. 2006) (citation omitted). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*. "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021) (quotation omitted). This is true "even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." *Long*, 532 F.3d at 795 (quotation omitted). "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001).

Defendants argue the traffic stop was unlawful because there was no probable cause to believe there was a traffic violation. The undersigned finds this argument unpersuasive. Deputy Parmer testified he observed the Equinox following less than one second behind a semi and an SUV. The relevant Nebraska statute governing distance between vehicles provides that the "driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway." Neb. Rev. Stat. §60-6,140(1). The Eighth Circuit has recognized that two seconds of following distance "is a widely used rule of thumb that accounts for the speed of traffic and is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance." *United States v. Lopez*, 564 F.3d 1001, 1003 (8th Cir. 2009) (quotation omitted).

The record shows that Deputy Parmer had an objectively reasonable basis for believing there was a traffic violation for following-too-closely. The video from the dash camera shows the Equinox quickly approaching a semi and then moving into the other lane to pass the semi. When Jiles moved to the passing lane, he was then following an SUV. The exact distance between the Equinox and SUV is not entirely clear from the dash cam recording due to the proximity of the vehicles to one another. However, Jiles indicated he was approximately six inches behind the SUV and acknowledged that he was probably following the SUV too closely. Further, Deputy

Parmer is an experienced officer with numerous years of experience. Deputy Parmer credibility testified there was approximately one second between the vehicles and that he considers three seconds a safe following distance based on the Nebraska Driver's Manual. Based on the evidence presented, the undersigned finds there was probable cause for the traffic stop.

### B. Reasonable Suspicion

Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission" during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. An officer cannot delay completing a citation just to complete a dog sniff without reasonable suspicion. *Id.* at 355-56.

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably [warrant] suspicion that a crime [is] being committed." *Beck*, 140 F.3d at 1136 (quotation omitted). In assessing whether the requisite degree of suspicion exists, a court must "determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." *Id*. "The totality of the circumstances—the whole picture—must be taken into account." *Id*. "[B]oth innocent and criminal acts can create reasonable suspicion." *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (citation omitted). Also, a court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Beck*, 140 F.3d at 1136 (quotation omitted). However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which "describe a very broad category of predominantly innocent travelers." *Id*.

11

Based on the totality of the circumstances, the undersigned finds there was reasonable suspicion to extend the traffic stop for the dog sniff. Deputy Parmer, who the undersigned finds testified credibility throughout these proceedings, identified multiple indicators of criminal activity, including the suspicious nature of Defendants' reported travel plans. Deputy Parmer asked Jiles, "You guys been on the road long today?" and Jiles shook his head yes. Deputy Parmer then asked, "Where abouts are you coming from?" Jiles said they were coming from a little bit past Nebraska, but that he did not know the name of where they were coming from.[3] This did not make sense because Jiles said the purpose of the trip was for him to look for a place to move. Also, the information Jiles provided about the trip conflicted with what the LPR system told him, so Deputy Parmer knew Jiles was being dishonest. The LPR system showed the Equinox had traveled westbound through Grand Junction, Colorado, which is more than a bit past Nebraska. The LPR system showed that the Equinox went westbound on February 27, 2023, and then turned around and went back eastbound through Grand Junction at approximately 11:00 p.m. on March 1, 2023. Based on this timeline, there would have only been a couple of days for driving all the way to the western point of Colorado and then coming back to the same point, evidencing non-stop travel. Jiles' illogical answers and travel plans support a finding of reasonable suspicion. *See United States v. Gastelum*, 11 F.4th 898, 903 (8th Cir. 2021) ("[O]dd answers and strange travel plans can support a finding of reasonable suspicion"); *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) (finding reasonable suspicion to extend traffic stop to conduct dog sniff based on incongruity between the driver's short rental period and his described travel plans).

A finding of reasonable suspicion is particularly supported by the inconsistency between Defendants' statements. Washington indicated they had been in Las Vegas. However, if that were the case, Jiles surely would have been able to recall where they had been—given the well-known nature of the city. Also, Las Vegas is much further than a little bit past Nebraska, contrary to what Jiles told Deputy Parmer. Given the differences between Jiles' and Washington's stories, it was reasonable for Deputy Parmer to conclude that one of them was lying about the location of the trip. *See United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) ("[C]onflicting stories may

---

[3] Jiles' attorney seems to argue that Deputy Parmer failed to clarify certain questions and information and, by doing so, made unreasonable assumptions. However, from a review of the video, it does not appear to the undersigned that Jiles misunderstood Deputy Parmer's questions or that Deputy Parmer purposely or otherwise made unreasonable assumptions about Jiles' responses to questions.

provide justification to expand the scope of the stop and detain the occupants"). Also, Washington's statement that the pair were in Las Vegas is itself suspicious given the timeline provided. The LPR system showed the Equinox traveled westbound through Grand Junction, Colorado on February 27, 2023, and then eastbound through Grand Junction on March 1, 2023— two days later. Grand Junction, Colorado and Las Vegas, Nevada are a significant distance apart, and Jiles indicated they had been traveling a day to a day-and-a-half and were headed back to Wisconsin. The timeline provided does not match Defendants' reported travel plans.

Deputy Parmer also credibly testified that when he initiated the traffic stop, he observed the occupants of the Equinox moving around a lot in the vehicle. Deputy Parmer further testified that he observed an overwhelming odor of air freshener coming from the vehicle and believed he could smell marijuana. He also smelled marijuana when Washington exited the vehicle. From Deputy Parmer's body camera recording, it seems Jiles was nervous during the encounter, which is consistent with Deputy Parmer's testimony. Jiles appeared to be breathing heavily and was watching Deputy Parmer very carefully. Jiles also kept making comments that his record was clean, and repeatedly mentioned that he had to go to the bathroom—seemingly to speed the traffic stop along. Based on the totality of circumstances, the undersigned finds there was reasonable suspicion to detain Defendants for the dog sniff.

### C. Standing & Search of the Equinox

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Barragan*, 379 F.3d at 529. "An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Id*. (quotation omitted). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir. 1994). Factors relevant to the determination of standing include: "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *Id*.

The undersigned finds Jiles has standing to challenge the search of the Equinox. In the Eighth Circuit, the driver of a vehicle may have standing to contest the search of a vehicle when the driver is not the owner, but is using the vehicle with permission of the lawful owner. *See United States v. Williams,* 714 F.2d 777, 779 n. 1 (8th Cir. 1983) (affirming the district court's finding that the defendant had standing to challenge search of car where defendant's nephew occasionally permitted defendant to use the car with the owner's knowledge, and gave defendant permission to use the car the day of the search); *U.S. v. Best,* 135 F.3d 1223, 1225 (8th Cir. 1998) (noting that if the defendant had permission to use the vehicle, he would have had a privacy interest giving rise to standing). Here, although Jiles did not own the Equinox, he was driving the Equinox at the time of the stop with Washington's consent. Washington had permission to use the Equinox, and Ms. Goodrich (the owner of the vehicle) assumed Jiles would be driving the Equinox on the trip. Jiles has demonstrated he had a reasonable expectation of privacy under the facts of this case.

Washington likewise has standing to challenge the search of the Equinox. The law in the Eighth Circuit is well-established that "a mere passenger does not have standing to challenge a vehicle search where he has neither a property nor a possessory interest in the automobile." *United States v. Anguiano,* 795 F.3d 873, 878 (8th Cir. 2015) (internal quotation omitted). However, a passenger may have a sufficient possessory interest in a vehicle when he has permission to use the vehicle from the lawful owner. *See United States v. Rose,* 731 F.2d 1337, 1343 (8th Cir. 1984) (finding that defendant, who did not own car, had standing where he had permission to drive the car, even though he was only a passenger at the time and had given his friend permission to drive). Washington was a passenger in the Equinox at the time of the traffic stop. However, Ms. Goodrich testified that Washington was her boyfriend at the time of the traffic stop and that she had given him permission to drive the vehicle. She further testified that Washington had driven the Equinox in the past and maintained the vehicle. Maintenance documents in the Equinox with Washington's name on them support Ms. Goodrich's testimony. Washington has demonstrated a sufficient possessory interest in the Equinox to provide him standing to contest the search.

As discussed above, Deputy Parmer had reasonable suspicion to detain Washington and Jiles for a dog sniff. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly,* 475 F.3d 946, 954-55 (8th Cir. 2007). "A drug

14

detection dog is considered reliable when it has been trained and certified to detect drugs." *United States v. Winters,* 600 F.3d 963, 967 (8th Cir. 2010) (quotation omitted).

The evidence shows that Keisy alerted and indicated to the odor of narcotics coming from the Equinox. The evidence also shows Keisy is a certified, reliable dog. Keisy is certified in the State of Nebraska, is certified annually, and was certified at the time of the events underlying the pending motions to suppress. Keisy trains for a four-hour period at least once a week. Deputy Parmer, who is an experienced officer and K-9 handler, explained Keisy's alert and indication behaviors, to include an over-interest in an area as an alert and then standing or sitting down to indicate. Keisy can be seen in the video footage showing an interest in the driver's side door seam—just as Deputy Parmer said. Keisy can also be seen sitting in front of the driver's side door immediately after alerting to the door seam. Deputy Parmer's testimony that Keisy alerted and indicated to the presence of narcotics is supported by the video footage. Keisy's positive alert and indication provided Deputy Parmer probable cause to search the Equinox.[4] Therefore, the undersigned finds the motions to suppress should be denied.[5]

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian Buescher that Defendants' motions to dismiss and motions to suppress be denied.

Dated this 29th day of December, 2023.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

---

[4] Defendants maintain that because their detention and subsequent search of the vehicle was unlawful, any incriminating statements they made must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471 (1963). However, because the traffic stop, detention, and search of the Equinox were constitutional, suppression of the statements is not required under the exclusionary rule.

[5] Defendants also argue that use of license plate readers violated their Fourth Amendment rights. This argument was not included in Defendants' briefing on the motions, but rather was only argued at the evidentiary hearing due to testimony that was elicited during the hearing. Based on the undersigned's conclusion that the traffic stop was supported by probable cause, and under the totality of the circumstances, there was reasonable suspicion to detain Defendants, the undersigned will not address this issue in this Findings and Recommendation.

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.